The court proceeds with the second case of the day, D'Angelo v. Melendez. Good afternoon, Your Honor. May it please the Court, I'm here today on a single issue, on a sentencing issue, in regards to whether this was, my client, Mr. Melendez, was part of the joint undertaking pursuant to 1P1.3. It is our position that the court, although found that there was a joint undertaking in regards to the case, and the judge was specific in regards to Mr. Melendez driving from Rockford to Chicago with Mr. Craig to purchase heroin, that the judge failed to talk about what the guidelines considered the other two steps in regards to 1P1.3 without actually conceding the joint undertaking. The focus of my inquiry at the actual sentencing hearing had to do specifically with the foreseeability in this particular case. In this particular case, I had an opportunity to cross-examine the co-defendant, Michael Craig. Michael Craig had indicated in his statement that Mr. Melendez was part of this conspiracy. However, with the opportunity to actually examine Mr. Craig, it was evident and it was clear that my client had no idea about the operation that Mr. Craig had. Craig initiated the connections. He was the one who put the cash to my client to drive to Chicago. Mr. Craig rented the car. Mr. Craig was the one who took the heroin. Mr. Craig was the one who divided the heroin. There's some dispute, but Mr. Craig testified under oath that my client Melendez did not bring money or not use the money to Rockford, that the money was all Mr. Craig's, that Mr. Melendez did not sell for Craig. Mr. Melendez did not have any idea what the operation was in regards to this issue, that the only thing that ties my client in to a joint undertaking is the first part of the analysis. But Judge Capallo failed to do the rest of the analysis on this, and I'll say it here. In fact, he really didn't have to. I mean, he completely disregarded Craig's testimony as unreliable. So in your general argument, it seems to me, it relies on the reliability of Craig, the co-conspirator. But the judge didn't accept Craig's testimony. Although it is interesting to note, Your Honor, that when Mr. Craig was sentenced, the district court judge did indeed give him his 5K acceptance of responsibility. So in one regard, in my case, he's saying that Mr. Craig is not credible, but at his evidence… He actually said he was not credible. He said he wasn't reliable. The judge did not object his testimony because he thought he was lying. So he still didn't give him the acceptance of responsibility credit in his own sentencing proceeding. He said he was unreliable for a whole variety of reasons because he was, I think he said, all over the map and internally inconsistent. That's a solid and important distinction. Yeah, I guess I don't quite appreciate it, but I understand what the court's position is on that. The idea of not discrediting Mr. Craig still doesn't understand where is the foreseeability component. Again, I would note that as of November 1st, we're going to have clarity in this particular jury instruction. And I've used that somewhat to follow my argument that it'll be a three-step approach. It's not necessarily a three-step approach now, but the verbiage and the language is still there. And the third step has to do with reasonably foreseeable in connection to the criminal activity. And so even if they're driving to Chicago to purchase heroin, that doesn't mean that Mr. Millet understands or has any idea of what is foreseeable in regards to what Mr. Craig is actually doing in regards to his position and what his operation is. Well, he doesn't need to have complete information about Craig's operation. He only needs to know that they're pooling their funds to get the bulk rate on the cocaine, and then they're using the cocaine in their own trafficking. So I would argue that the court is indicating that there's a joint undertaking, which is step number one, which is, yes, they got together. They pooled some – ostensibly pooled some money. There's some – I would dispute that, but for purposes of right now, that they would pool their money and that they would drive to Chicago and that they would purchase heroin. Therefore, we have a conspiracy. Therefore, my client admitted his responsibility and pledged to the conspiracy. But in regards to specifically the knowledge and foreseeability of what Mr. Craig is doing with his weight, because that's the only way that the judge is able to attribute or piggyback the entire weight that Mr. Craig is using for my client. Because – but for that amount, there would be – it would not be – it would be accessible to him. I believe that I have one minute, so maybe I'll just say that for a short rebuttal. I appreciate it. Thank you. Okay. Mr. Cooper? May it please the court. Ms. Lambert is here also on one issue with respect to sentencing. The only issue in Ms. Lambert's case is whether the district court abused its discretion in imposing a sentence of eight months in light of her serious health issues, her life expectancy of only 90 months, with a better than one in three chance that she would not survive more than 60 months, her low risk of recidivism, and the likelihood that she would successfully complete the period of probation. Frankly, our biggest fear before this court is that the court might adopt the presumption that a within-guidelines range is reasonable and not consider the underlying facts. Let me say a few words about the presumption. First, it's not only not conclusive, it's not intended to be highly deferential, and that language comes from Justice Breyer's opinion in Arena v. United States. The second point I want to make about that, and it's a corollary to the first, is that it is possible for a within-guidelines range sentence to be substantively unreasonable and to be an abuse of discretion. The government's cases in their brief even say that in order to sustain the presumption, the district court must provide a justification for the sentence which not only allows for adequate health review, but which promotes the perception of fair sentencing. That language seems to impose upon the district judge some sort of burden to show that the presumption ought to apply. The third point I want to make about the presumption is that there's no reason in this case for the court to presume that the district court was in a more superior position to make determinations based on the facts in this case than is this court. You want to keep pushing the court of appeals to do the sentencing, don't you? No, I want to push the court of appeals. That's typical. That's what we see. I want you to take a hard look at whether or not this sentence is justified or whether it's abuse of discretion. The point I was making there was that there were no fact-credibility issues because there were no witnesses, and the district court was not in a superior position. This court is in as good a position as the district court in the office. That misunderstands the standard of review. We defer to the district court's decisions as to the weight to give the different factors there. As I understand your argument, it's not that there was any kind of procedural error committed at sentencing here. The judge said plenty to justify his decision, and there wasn't any miscalculation, as in the last case. You're arguing about the weight or lack of weight that the judge gave her medical condition, as I understand the core of your argument, and that that's why the sentence is substantively unreasonable. So you're asking to substitute our judgment as to the weights that that factor deserves for the district court's judgment. What bound do you make on sentencing appeals? I'm certainly asking you to substitute your judgment on the weight, but that's not the only thing I'm asking. I'm saying that this judge's determination of what weight to give to her medical condition, which was essentially no weight, was an abuse of his discretion. I mean, there is a point at which your disagreement is not only because you would have done it a little differently, but there is a point at which the undisputed evidence in the case simply does not support at all the judge's determination as to what weight to give. Judge Coppola, and I have the highest regard for Judge Coppola, Judge Coppola treated Ms. Lambert the same as he would have treated somebody who was perfectly vigorous and healthy, and yet Ms. Lambert had congestive heart failure. She had this very limited life expectancy as well as quite a number of other medical conditions that are outlining it. Right, and the judge took note of all of that, didn't he?  He took note of it, Your Honor, but did his sentence reflect what the undisputed evidence showed was a reasonable sentence, and did it promote the perception of fair sentencing? With respect to rehabilitation, which is 135, we'll get back up, what we're saying is that the sentence was an abuse of discretion because it clearly, at the undisputed evidence, did not satisfy the 3553A factors. I want to talk about two of those in particular. One is rehabilitation. 3553A, amongst its requirements, says that the sentence should impose, should provide the defendant with needed medical care in the most effective manner. Judge Capaldi treated Ms. Lambert as if she was a healthy and vigorous defendant. He did not take into account the seriousness of her medical condition, the fact that she was in under the care of various specialists, which had postponed the sentencing hearing quite a number of times, and simply said that he thought the government, the Bureau of Prisons could offer her effectively. There was very little evidence to support that. I did point out to the judge that the Bureau of Standards, standards for what treatment they are required to provide their inmates is what is minimally adequate, whereas she was getting optimal care from the doctors and the specialists in Iraq. The second 3553A factor that I think Judge Capaldi said was disregarded was incapacitation. This 56-year-old lady was not, and still is not, a threat to recidivism. She clearly committed a number of minor offenses as a young woman, but these were as a young woman for the most part. She had a number of retail misdemeanors. She had three felonies, which I would say were borderline felonies, one for disorderly conduct, involving a false report to police at age 26, one for a felony for retail theft at age 31, which was shoplifting clothing, and one for retail theft at age 41, 15 years before the sentencing hearing, for shoplifting nine cans of Similac. Her involvement in the conspiracy, based on the statement in the plea agreement that was agreed to, shows that it arose from her caregiver role. She was the babysitter for Mr. Craig's children. She was employed by Mr. Craig, and the court found she was subservient to him. Mr. Craig asked her to do some things that she shouldn't have done. She very foolishly complied with her request, and therefore fell into doing some things that should have helped the conspiracy. I see that I'm left with just a little bit of time, so I would ask. Let me just ask you one area of inquiry. It seems to me you've placed great stress on her physical condition, and if I could just put aside her bio record for a second and just focus on that. Don't we have a district judge who has concluded she does not have, I think in his words, an extraordinary physical impairment or that she is seriously infirmed? I mean, I appreciate the question of how you describe it, but isn't that the finding we have of the district judge on what is really the critical anchor of your argument? You have that finding. He does say that. You have that finding based on undisputed facts that do not support that finding. So you're saying that's almost clear error? Yes, it seems to me. That the evidence against her regarding her medical condition is contrary to that conclusion? Absolutely. Absolutely. Thank you. Thank you, Mr. Cooper. Mr. Patterson? Thank you. May it please the court, Joseph Peterson, on behalf of the United States. Excuse me. We've got a misprint. Oh. The evidence, Patterson. Oh, yeah. It's no reason. We're in Wisconsin, so. The district court correctly calculated the amount of heroin intrusion to defendant Melendez, and in addition, the district court also imposed a sustainably reasonable sentence as to defendant Langer. Therefore, we're asking that both defendants' conditions and sentences be affirmed. Specifically, as to defendant Melendez, the district court found that the most reliable evidence of the joint undertaking in this case came from the defendant's own statements, including a screening where he admitted that he was part of a conspiracy with Michael Craig to distribute heroin, right, because that's what he tends to distribute, and that as part of that conspiracy, the two of them pooled their money together, and they usually took about $4,000 and purchased heroin for $80 a gram for a reduced rate. So when the defendant today argues that they dispute that evidence regarding the fact that they pooled the money together, Judge Rapallo found that not based on anyone else's testimony other than the defendant's own statements, including his admissions and screening. So we believe that the district court correctly credited or correctly attributed all of the heroin that the defendant and Michael Craig jointly purchased during their trips to Chicago every two to three days during an 8-month period as the defendant admitted. Therefore, there was no error in the district court's calculation of the defendant's sentence and range. So unless there are any other questions regarding Defendant Landis, I will move on to Defendant Landis' arguments, and I would just agree with what Judge Sykes said regarding the standard in this case. What the defendant is asking you to do is get a second opinion regarding... Excuse me, before you get back into the frequency of the trips to Chicago, was there an issue with regard to that, or was that what they made in their plea agreement, that they said they went that frequently? In the plea agreement, the defendant admitted that he went to Chicago every two to three days to purchase heroin, and there was additional testimony regarding the length of the time that they went. The judge decided to take the most conservative estimate as to the length of time, being the 8 months, it could have been as many as 10 months, as the judge stated. And then, as far as the frequency of the trips, the judge calculated conservatively, every two to three days, basically meaning every two and a half days, which is two and a half days out of 30. But anyway, that was the length used regularly and was by one to certify it. Correct. That was the defendant's admission when he was first approached by law enforcement officers that he affirmed a relative hearing duty and also in the plea agreement. There was an internal inconsistency in Lendez's own statement about the amount of heroin that the money had been purchased. Correct. He said that they would take $4,000, purchase heroin for $8 a gram, but then he also stated that they would buy between 25 and 40 grams of heroin. And Judge Tripala, again conservatively, found that there was 32.5 grams purchased each time they went to Chicago, even though the defense plea agreement appeared to be a larger amount. Right. You're in his favor. Correct. Okay. As a two-defendant member, it's not the role of this court to be weighing all of the district court sentencing evaluations and weights that the district court placed on all of the different arguments and evidence that was presented. What the district court did in this case was carefully consider all of the defendant's arguments and medication and weighed them against the other evidence in the case. She did have a really minor role, didn't she? Well, the court found that the defendant did not challenge the fact that the defendant was an average participant. I mean, in addition to admitting that she allowed heroin and proceeds to be stored in the apartment that Michael Craig paid for her living for no charge, she also... So she could take care of the kids, right? That was... Well, and also so that the heroin could be stored there and that she could distribute heroin to his lower-level members of the conspiracy and distribute it on his behalf. What was the evidence of her involvement in distribution? She admitted that she would distribute heroin from time to time to the other individuals that were involved in the conspiracy that actually sold heroin on the street. She also admitted that she would... So she wasn't herself trafficking. She's a runner. Correct. She also distributed the heroin to... Or, I'm sorry, collected proceeds and then provided them to Michael Craig after those individuals would sell the heroin. In addition, she... She also, as part of our investigation, she was caught speaking to one of our cooperating witnesses, directing him as to where to go to pick up heroin that he wished to purchase, and then she contacted one of the co-defendants who distributed the heroin and he made arrangements for them to connect with each other so he could purchase it. So it wasn't just merely that she was at this house and was known to be involved. And again, that finding was not challenged by the defendants in the district court. Her record is long, but consists of extremely minor offenses. Was that overvalued by the judge, do you think? You kept talking about the long record. Right. Well, the district court discussed not only the length of the record, but the fact that she continued to violate court orders when she was placed on probation. That is really true. That's tough. Well, one of the concerns that the district court had, though, was that she graduated from trivial matters, as you call them, although, I mean, there were serious driving offenses, felonies, retail theft, forgery, but she graduated from that at the age, in her 50s, into being involved in a large-scale drug insurancy. And that was one of the things that the district court relied on as part of rejecting the defense arguments and litigation and finding an assent within the guideline range. And two months above what went into the guideline range was appropriate. And the district court, in this case, would have been justified in giving her a higher sentence with her medical history, given the fact that she had that extensive criminal history. What did the government recommend? We recommended an assent within the guideline range and did not make any specific recommendation. And he got the low end and the bottom. She got two months above the low end. She was sentenced to 80 months, and the low end of the guideline range was 78 months. Do you challenge Mr. Cooper's assertion that the evidence of her health was adequately considered by the district judge? Yes, we do. The district court extensively discussed her expected... We have the district judge's conclusion. I'm just asking if you think that what was presented to the judge... Well, other evidence... Well, there was other evidence in the record that the court relied on, specifically the fact that while the defendant was on pre-trial release, she continued to work taking care of another individual, another elderly woman. In addition, the defendant had a positive test result for using cocaine while she was on pre-trial release. That's another factor that the court considered regarding her health and medical history. So, we believe that the district court's decision... Would you say the district court arrived at a sentence because it allowed for the medical condition? Would you conclude that? The district court... The 78 was the lowline. Correct. Gave 80 months. So, you're suggesting we should conclude that the decision to go with the lowline was a recognition of this health issue as presented by the defense counsel? If she had had no medical history of any kind, the district court likely would have sentenced her to a higher sentence within the guideline of an emergency based on her involvement in the conspiracy. None of the other... I'm sorry. The court probably considered her medical history. The court even went into the, by way of analogy, the guideline section regarding extraordinary physical impairment and discussed that. And those were some of the things that the court cited regarding the fact that she would continue to work. What evidence did she present with regard to her medical condition? What type of evidence? She presented written documentation from... No live witnesses or any... No. And her attorney provided additional information to Judge Rapallo in the sentencing to clarify some of the points that were raised. And as the defendant argues, the court credited that information, but the court just chose not to give it as much weight as the defendant wanted them to. So... There was a likely expectancy, which was provided by some organization, that we put in a particular package. Is that right? Right. Originally, it was a higher expectancy, but there was an issue of the doctor putting the need to increase weight on the first woman, so... So we believe that the district court did properly weigh all of the appropriate sentencing factors, gave the appropriate weight to all the defendants' arguments and the evidence that they presented, and we would ask that this court affirm the sentence of the district court and find the sentence that you want to sustainably use more. Thank you. All right, Mr. Judge. Mr. Judge, the time people tell me you have one minute, but you may have two. So I'd like to just talk about this statement that Mr. Melendez made. This is like a statement that keeps on ticking. It's a self-fulfilling prophecy. He's arrested a year before the indictment. He's a 46-year-old Hispanic man who, although speaks English, is more fluent in Spanish. He's in a small room with two FBI agents, and you have five lines of a statement that he's made, and he typed up, and the entire statement took less than a half an hour. This statement has followed Mr. Melendez to a grand jury where he is presented to the grand jury with this five-statement document. Less than half an hour. I'm telling you, this statement has haunted him the entire time of this. It's gone to the grand jury, it went to his plea, and then the judge uses it completely at his sentencing. And the idea that we're continuing in this cycle of sentencing illiterate and poor individuals when they have made a small statement and then that just carries along with him, seems to me that there has to be some sanity at some point in time. Well, after he had counsel, did he contest it? I came along at sentencing, and so the plea agreement had already been negotiated. After he had counsel, there was no record of it? I don't know if he had counsel at the grand jury, but I think what Mr. Melendez's position was is that part of the plea agreement that was negotiated was that he always agreed or admitted that he did not purchase this amount of heroin, that a paragraph within the plea agreement did allow him to argue at sentencing that it was, I think it was 10 grams out of the 40 grams. And so I think he relayed that component of this and allowed him to have the ability to argue as I did at sentencing, and that's why we had a very lengthy sentencing hearing. I see that my time is up, so if the court has no other questions, I would ask that you, based on clear error in regards to the evidence, that you will return the sentencing issue and send it back to the judge for resentencing. Thank you very much. Thank you, Mr. Judge. Mr. Cooper. Mr. Cooper, your time has expired, but you may have an additional two minutes. Thank you. I just want to respond to the question regarding where the medical evidence came from, so we're clear on that. We had voluminous medical records from Ms. Lambert, most all of which were provided by the probation department to me, and I had summarized them and asked that they be included in the pre-sentence report, which it was, along with some definitions of medical terms that came from online research. So there's a great deal of detailed medical evidence in the pre-sentence report. The Seattle heart failure monitor, the device that came up with the seven-and-a-half-year life expectancy, was attached to a sentencing memorandum and a supplemental sentencing memorandum, because there were two of them, and that is a result of simply inputting data regarding lab reports, age, weight, and so forth, into this program that was devised by doctors at the West Coast, and that came up with the seven-and-a-half. So that was where the medical evidence and the life expectancy came from. Unless the court has any other specific questions for me, I'm going to hand the report over to Bruce and Dan. Thank you, Mr. Cooper. Thanks to all the counselors. Mr. Cooper, you were appointed by the court, and you have the additional thanks of the court for particularly representing your clients in this case. Thank you. All right, the case is concluded.